ISAAC ABRAMSON, Appellant, *v.* BENJAMIN LEO and Others, Respondents, Impleaded with JACK LEO and Others, Defendants.

First Department, February 23, 1934.

*Herman Shulman* of counsel [*Mortimer Hays, Benjamin Algase* and *Charles E. Rhodes,* with him on the brief; *David M. Berger,* attorney], for the appellant.

*Harry I. Stein* of counsel, for the defendant Leon Kauffman.

*Leon Kauffman* of counsel, for the defendants Benjamin Leo and others, and Rhebem Theatres Corporation, Portchester Theatre Realty Corporation and State Theatre Realty Corporation [*Finkler & Finkler,* attorneys for said corporations], for the respondents.

MARTIN, J. The plaintiff seeks to recover damages for fraud due to an alleged conspiracy on the part of the defendants to deprive him of his stock in the defendant corporations. The indi-

vidual parties hereto, with the exception of Benjamin Leo, were jointly interested as stockholders and directors of corporations which owned valuable moving picture theatres.

In the fall of 1928 the Fox Metropolitan Playhouses, Inc., was organized for the purpose of acquiring a large number of moving picture theatres. Thereafter negotiations were opened by the defendant Strauss on behalf of the plaintiff and the other parties to this action to arrange for the purchase or leasing, by the Fox interests, of the theatres owned and operated by the corporate defendants.

All the defendants, respondents, realized that the consummation of this deal would enhance the value of their stock. They also knew that the co-operation of the defendant Benjamin Leo, a brother-in-law of the president and the vice-president of the Fox companies, a brother-in-law of William Fox, and a brother-in-law of the defendant Ungerfeld, was needed and would be of incalculable aid in their efforts to close a deal with the Fox interests.

It is the contention of the plaintiff that with that knowledge the defendants conspired to induce him to sell his stock in the defendant corporations to the defendant Benjamin Leo at a wholly inadequate price; that they conducted the negotiations with the Fox interests without informing him of the developments, at a time when the plaintiff was occupied with his duties as manager of the theatre in Nyack, N. Y.; that on several occasions, more particularly referred to in the record and testimony, the plaintiff inquired of the defendants the status of the Fox deal, and *was told that the deal was off; that it was dead;* and that Fox was not interested in the purchase of the theatres of the defendant corporations.

These representations were made to the plaintiff and repeated down to and upon the very day on which he sold his stock in the defendant corporations to the defendant Leo. He says that in absolute reliance upon these representations he sold his stock to Leo. The plaintiff asks: What other explanation can be made for selling such valuable stock for a wholly inadequate price?

The plaintiff contends that these representations were false; that at the time they were made to him the Fox deal was not dead but was practically concluded, all the terms had been agreed upon, and the only thing remaining to be done was the signing of the formal contract with the Fox interests.

In fact, the plaintiff claims that on Friday, January 4, 1929, the date upon which he transferred his stock to Leo, the Fox deal had been concluded, all the terms had been agreed upon a month prior thereto, the contracts in their final form had been prepared

and approved, and were in fact executed on January 7, 1929, which was the following Monday, *a Saturday and Sunday* intervening. It is significant to note that the date on the cover of the contract is January 4, 1929.

The plaintiff says he knew nothing of the consummation of the Fox deal until January 20, 1929, and that he learned of it through a newspaper clipping. He immediately accused the defendants of having perpetrated a fraud upon him and tendered back the consideration received for the stock and demanded a rescission. The defendants refused to accept his tender and the plaintiff thereupon instituted a rescission action. Sometime later he learned that his remedy was not an action for rescission, and on stipulation of the parties that action was discontinued and this fraud action for damages was instituted.

At a trial which lasted six days the issues involved were fully presented by both sides, and the jury found a verdict for the plaintiff for the sum of $106,898 against several of the defendants. The court thereafter set the verdict aside as excessive, and as against the weight of the evidence and dismissed the complaint as against the defendant Benjamin Leo upon the ground that the previous rescission action was a conclusive and binding election against him, precluding the institution of an action for damages for fraud. The jury found a verdict in favor of the defendant Kauffman.

We must decide whether the jury was justified in finding that the defendants, by fraudulent representations as to the status of the Fox deal, induced the plaintiff to part with his stock in the defendant corporations, to his loss and damage; or, as the court said, the question is whether the plaintiff at the time he sold his stock, was deceived concerning conditions of the negotiations with the Fox Company, or whether he knew the real conditions of those negotiations and that they were pending, *though not concluded when he sold.* We must also decide whether the verdict is excessive, and whether the institution of the prior action in rescission against the defendant Benjamin Leo, was an election of remedy, so as to bar this action against the said Leo; and also whether the verdict in favor of the defendant Kauffman was against the weight of the evidence.

The plaintiff claims that he proved every necessary element to sustain his claim of fraud; that the amount of the verdict was in accordance with the undisputed evidence and the charge of the court; that the amount was conservative, and that the court erred in setting aside the verdict of the jury, which was an improper interference with the functions of the jury. The plaintiff also

contends that the court erred in its ruling upon the question of election and in dismissing the complaint as to the defendant Benjamin Leo.

We believe that the jury was justified in finding that the defendants by fraudulent representations as to the status of the Fox deal induced the plaintiff to part with his stock; that the verdict to that extent was proper; that the institution of the prior rescission action against Benjamin Leo was not an election of remedy so as to bar this action against that defendant; that the verdict in favor of the defendant Kauffman was against the weight of the evidence.

A clear-cut issue of fact was presented and the determination of that issue rested largely upon the credibility of witnesses. That issue was presented to the jury by a charge of the court, to which no exceptions were taken by the defendants. The verdict of the jury, against the defendants, was supported by the weight of the credible evidence. In setting aside the jury's verdict the court indicated that it did so because it did not believe the plaintiff's testimony.

In the absence of the slightest indication of bias, passion or prejudice on the part of the jury, there is afforded no ground for setting aside this verdict. It is elementary, that a jury's verdict cannot and should not be set aside merely because the trial justice reached a different conclusion upon the facts, particularly in fraud cases which generally involve the credibility of witnesses. While it is impracticable to set forth the facts in detail, a recital of a few will suffice to show how this court reached its conclusion.

The plaintiff, Isaac Abramson, from 1921 to 1928 was associated with the defendants Strauss, Ungerfeld and Kauffman as a costockholder and codirector in various close corporations, operating, directly or through subsidiaries, a number of motion picture theatres in the States of New York and Connecticut. These corporations were the defendants Rhebem Theatres Corporation, Portchester Theatre Realty Corporation and State Theatre Realty Corporation.

On December 28, 1928, the date of the contract of sale by plaintiff of his stock in these corporations to the defendant Benjamin Leo, he owned 227 shares out of an outstanding issue of 1,000 shares of the capital stock of the Rhebem, 25 shares out of the outstanding issue of 100 shares of the Portchester, and 37 shares out of 150 outstanding shares of the State Theatre Realty Corporation.

It is important to note that the defendant Kauffman was the attorney for these corporations as well as for Benjamin Leo. The defendant Benjamin Leo was not a stockholder or director in any

of these corporations, although he had a half interest in the Ossining Theatres Corporation, which held the lease on the Victoria and Parthenon Theatres at Ossining, N. Y., the other half of which was owned by Rhebem Theatres Corporation.

During the period of his association with the defendants, the plaintiff acted as manager of the Broadway Theatre at Nyack, under a contract dated June 1, 1925, which provided, among other things, for his employment as manager for a term of five years ending April 30, 1930, and which also granted him the option of renewal of the contract from year to year upon giving appropriate notice.

The plaintiff devoted all his time to his managerial duties at Nyack, and seldom visited the main office of the corporation in New York city. He left to the defendants Ungerfeld and Strauss the actual management of the general affairs of the corporations, and to the defendant Kauffman the legal care thereof, relying upon the others for the protection of his general interest in the companies and for carrying on negotiations dealing with his and their joint interests.

In the fall of 1928 the Fox Theatres Corporation, which it is alleged had financial resources of substantial proportions, organized the defendant corporation known as Fox Metropolitan Playhouses, Inc., for the purpose of acquiring, for the most part within the metropolitan district of New York, some 100 to 200 moving picture theatres.

In August, 1928, the defendant Strauss, with the knowledge and consent of the directors and stockholders, *other than the plaintiff, who says he was entirely ignorant of their intentions* and plans, took up with one Blumenthal, an agent, the submission for sale or lease of the theatres owned by the defendant corporations to the Fox Metropolitan Playhouses, Inc. The plaintiff says he first learned of these negotiations some months later when he received a letter, dated November 27, 1928, signed by Ungerfeld, announcing to the plaintiff the proposition of a sale of the theatres to the Fox Metropolitan Playhouses, Inc., and calling upon the plaintiff to submit an inventory of the Broadway Theatre.

It is claimed by the plaintiff that he was not informed of the plans of these defendants, of the terms of the proposed submission, or of any of the negotiations had with the representatives of the Fox Metropolitan Playhouses, Inc. Although the defendants at this time referred to a sale, it was in fact a leasing of the theatres which was the subject of the negotiations. The plaintiff, for a considerable period after 1928, believed that a sale of either the stock of the defendant corporations or the assets of the theatres

was involved, and not a leasing. This ignorance of the nature of the Fox deal on the part of the plaintiff is pointed to as one of the indications that he was defrauded.

The plaintiff complied with the letter of November twenty-seventh, and sent to Ungerfeld the inventory requested. He thereafter had several telephone conversations with Ungerfeld in which he inquired concerning the Fox deal mentioned in the letter.

The plaintiff testified that Ungerfeld replied: " It doesn't look so hot, it looks doubtful, and I don't think we will be able to put it over."

This testimony is substantially corroborated by Ungerfeld, who stated that up to the time of the inventory the prospects of putting through a deal with Fox were " very slim, very poor." Because of this statement made by Ungerfeld, the plaintiff says he failed to ask him concerning the terms, such as price, in the belief that the deal would not be completed.

The appellant says that during this very period negotiations with Fox were progressing most favorably; that the testimony shows that all of the actual terms had been fully agreed upon, and that during this same period the drafts of the agreement of lease were being prepared; that these statements to plaintiff were obviously being made and repeated to induce him to enter into the agreement to sell his stock, which sale was afterwards consummated.

About the middle of December, 1928, the plaintiff received a telephone call to go to New York to see Ungerfeld. At this conversation, Ungerfeld informed plaintiff that it was necessary for the corporations to raise at least $5,000 in view of their bad financial condition; that bankruptcy faced the corporations and that Rhebem owed $70,000. Plaintiff inquired concerning the proposed Fox deal and the answer of Ungerfeld was: " Forget it, that deal is off." This statement was repeated by Strauss.

On December 28, 1928, the plaintiff met the defendants Ungerfeld and Strauss in New York and reported to them that he had been unable to get a loan from the bank, as he had been requested to do by the others. When Strauss heard this, he said: " You know damn well that * * * the Fox deal is off and if you can't raise the money it will be bankruptcy;" and further continued: " Well, I am through. If Ben Leo wants to buy me out, I will sell him."

At this moment the defendant Benjamin Leo, pursuant apparently to a prearranged plan, walked in. The circumstances clearly indicate that this was not a coincidence, but that what followed was part of a carefully laid scheme to get the plaintiff committed then and there to sell his stock.

Benjamin Leo was a brother of Joe Leo, who was at the time president of Fox Metropolitan Playhouses, Inc., and of Jack Leo, a vice-president of Fox Theatres Corporation. The Leos were brothers-in-law of William Fox, who was at the time the president and principal stockholder of Fox Theatres Corporation, which owned and controlled Fox Metropolitan Playhouses, Inc.

When Leo walked in Strauss asked him, in the presence of the plaintiff and Ungerfeld, whether Leo would buy out Strauss' stock interest in the defendant corporations. They talked about it for a short time and then the defendant Benjamin Leo finally agreed to purchase Strauss' stock for the sum of $25,000, stating that he would meet him on Monday at Kauffman's office to draw the contract.

The plaintiff says it is clear that the sale by Strauss was never contemplated. No such sale was ever made, and beyond this initial conversation in order to induce the plaintiff to make arrangements concerning his stock, no further attempt to sell was made by Strauss. It is argued that this clearly indicates that the trap was being set to allure the plaintiff into selling his stock. Ungerfeld then asked the plaintiff why he did not sell out to Leo. The plaintiff answered: " There is no need of selling out. You are getting the man with the money [Benjamin Leo] into the corporation and there is no need for me to sell out."

Ungerfeld then pleaded with the plaintiff to sell out, stating that bankruptcy faced the Rhebem Corporation; that financial aid was needed for Rhebem Corporation and that Strauss was only bluffing, because he never intended to sell out by reason of his difficulties with his creditors.

At this point Benjamin Leo broke into the conversation, saying to the plaintiff: " I am a gambler, I will buy you out. I will give you $32,500," which offer, upon Ungerfeld's urgent pleading, the plaintiff accepted and speedy arrangements were then made to immediately draw a contract for the sale of plaintiff's stock to Leo at Kauffman's office.

The plaintiff says that he was thus induced to make this contract for the sale of his stock by the representations of the defendants that the Fox deal was definitely off; that the theatres in which he was interested needed someone with money to come in to avoid bankruptcy, and that his act was necessary for the preservation of his own interest, as well as the interest of his costockholders. On the way over to Kauffman's office the plaintiff asked Leo concerning the result of his negotiations with Fox with respect to certain theatres in which Leo alone was interested. Leo, playing his role in the scheme to defraud the plaintiff, continued to mis-

represent the actual situation by stating, " Fox won't take my theatres and he don't want your theatres." Leo added that he proposed to install " sound " in the theatres.

The above are a few of the statements made by the defendants concerning the negotiations with Fox, and the jury found the plaintiff relied wholly upon the representations aforementioned in the belief that they were truthful.

Upon the consummation of the Fox deal the stock held by these parties became very valuable, and it is clear that the fair value of the plaintiff's stock, having the Fox transaction in mind, was substantially above the sale price.

It has been established by overwhelming evidence (1) that the sale of the plaintiff's stock was made by him because of his belief that the Fox deal was off; and (2) that the value of that stock depended principally upon the status of the Fox deal. The representations alleged to have been made were also proved by the testimony of defendant Kauffman in his examination before trial. Kauffman testified that the Fox deal was dying at the time the above-mentioned representations were made by Ungerfeld, Strauss and Leo to the plaintiff. He stated upon that examination as follows: " It seems to me that the general belief in the trade was that the whole proposition was dying of Fox buying all these theatres and it came to life again *just about the time the Abramson-Leo contract was signed.*"

The testimony brought out upon the trial from Kauffman himself shows that during this very period when Kauffman claimed that the deal was dying, it had been consummated personally by him and that he was engaged at that time in going over the drafts of the final contracts after all basic terms had been finally agreed upon, and the contract was signed a few days later.

The defendants rely principally upon the fact that at the time of the sale of plaintiff's stock there was inserted in the contract a clause " and it is known to the party of the second part that negotiations are now pending and not concluded with Fox Metropolitan Theatres Corporation," and that the plaintiff gave a release specifically releasing the defendants, as follows: " from any claim that I now have or may hereafter have arising out of or in connection with negotiations now pending with Fox Metropolitan Theatres Corporation."

The plaintiff says that these documents most emphatically prove that the fraud practiced upon him had all been planned at the time these papers were signed, and that instead of these papers protecting the defendants they unquestionably prove the scheme that was being carried out by defendants with the aid of the lawyer

who prepared the papers. The plaintiff says that the strongest evidence of that fact is that the lawyer who drew these papers had been working for over a month arranging the details of the contract that had been made with the Fox Metropolitan; that at the time he inserted the clause in the contract and arranged for the release of any damages the plaintiff might have by reason of the Fox deal, he then knew that the Fox deal had been fully consummated. That fact is conclusively proved by the papers produced in evidence, which establish (1) that the Fox deal had been consummated; (2) that it had been consummated by the lawyer who inserted the clause in both the contract and release; and (3) that he concealed this knowledge from the plaintiff whom he represented in a fiduciary capacity, being at the same time the attorney for the moving picture corporations in which plaintiff owned the stock he was selling to Leo.

The examination of the lawyer before trial forcibly indicated that he was still trying to conceal this knowledge, for he said, " It seems to me that the general belief in the trade was that the whole proposition was dying of Fox buying all these theatres and it came to life again *just about* the time the Abramson-Leo contract was signed."

While this statement is couched in subtle language, nevertheless, the record shows that at the time the Abramson-Leo contract was signed the deal was not *just about* to come to life again, but had been consummated for over a month, and that the papers at that time had been prepared and were ready for signature.

Two things stand out in this case: (1) That it is not likely that a man would knowingly sell valuable stock for a small sum of money, especially in view of the fact that it is conceded that the consummation of the Fox deal made this stock very valuable; and (2) that the effort to avoid all damages growing out of the Fox deal was so studied and so marked, and the precautions taken were so deliberate there must have been an effort to conceal the fact that the Fox deal had been completed. Why were all these precautions necessary if it were not for the fact that the defendants felt that when the plaintiff learned of the deception he would immediately sue for damages because of fraud? Like most of these transactions, the precautions taken to avoid liability were overdone. The jury very properly believed that the execution of these documents only emphasized the fact that the scheme to defraud the plaintiff had apparently been thoroughly planned in every detail.

The evidence on this particular subject is interesting, especially in view of the fact that the contract stresses the fact that the Fox deal was still pending *but not concluded.* The insertion of these

words by the lawyer at a time when he knew the deal was concluded is strong evidence of a consciousness that a fraud was being perpetrated. The lawyer for the defendants evidently believed that it was a very skillful piece of work to insert in the contract a clause that the deal was still pending but not concluded and to obtain a general release of the defendants from any damage in case the Fox deal should go through. The reason for the eagerness to get plaintiff's stock was clearly shown by the fact that the Fox deal was ready for closing and could not safely be put through in a manner to exclude the plaintiff from its benefits, without first obtaining his stock. The defendants knew that if they told the plaintiff that the Fox deal had been completed he never would have parted with his stock for any such low price.

The trial court in setting aside the verdict attached importance to the insertion in the contract of the particular phrase referring to the pendency of the Fox negotiations. At the conference at which the stock was sold, in answer to plaintiff's objection to any such recital, defendants insisted upon it to prevent, as they said, the repetition of a prior unfortunate experience, but reiterated the fact that the Fox deal was dead, and the defendant Kauffman stated at that time that nothing but a miracle could reopen the Fox deal. The truth was that he not alone had power to work that miracle but had accomplished that feat prior to that time.

Between December twenty-eighth and January fourth the plaintiff received no information concerning the Fox deal, and was still of the belief on January 4, 1929, that the Fox deal was dead, as had been represented to him by defendants.

On January 4, 1929, the plaintiff, Berger, Strauss, Ungerfeld, Leo and Kauffman met in the latter's office. Leo then stated that he had just learned by examining the books since the last meeting with plaintiff that the corporations were in debt in excess of $70,000 and that he would not pay the sum fixed in the contract, $32,500, offering the plaintiff instead a certified check for $27,500. This was an attempt to save another $5,000 after Leo had agreed to pay $32,500.

In an affidavit which Leo submitted in a proceeding in this case in February, 1929, about one month after this occurrence, he stated he had demanded the reduced amount because of his discovery of numerous large items of liability between December twenty-eighth and January fourth. Upon the trial he testified that it was only one item of $20,000 that had been discovered which caused his demand for a reduction in price. These inconsistent statements, under oath, lend additional proof of the bad faith of the defendants and show that they were very artfully

attempting to indicate reluctance and unwillingness to proceed with this transaction with the plaintiff.

It is clear that Leo, who admitted that he had been kept advised by Strauss, must have known on January fourth, when he was sitting at the table with Abramson closing this transaction, that all the details had been completed with Fox, that the final agreements were ready for signature, and he was pretending to reject for a figure of $32,500 what the jury found was worth conservatively in the neighborhood of $135,000.

It seems to us to be utterly inconceivable that under any circumstances plaintiff would have gone through with this transaction, except for the skillful manoeuvre through which the defendants succeeded in giving the semblance of an honest transaction to a fraud.

The record discloses that the plaintiff refused to accept this check and offered to return Leo's deposit and rescind the deal. Leo thereupon offered to pay plaintiff $30,000. Plaintiff, still refusing, had left the room when Strauss stopped him at the elevator, begging him, " For God's sake, don't be so stubborn and see what happens; if the Fox deal wouldn't have fell through, we would not have to do that. * * * Save us from bankruptcy. * * * I will get Benjamin Leo to give you another $1,250."

Thus, on the very day that the Fox deal was in final shape, the plaintiff was prevented from calling off his negotiations. He was induced to make the sale upon a renewal of the representations that the Fox deal was off and that the companies were facing bankruptcy.

That negotiations were pending at the time the defendants represented they were dead is established by the fact that on Monday, *January 7, 1929*, a lengthy formal agreement was signed by the Fox interests and the defendants. *January fourth*, the date upon which the plaintiff sold his stock to Leo, was a Friday. The contract with Fox was signed by the defendants on the following Monday, January seventh. In fact, the defendant Strauss admitted that he knew the deal had been closed with Fox at the very time the plaintiff was selling out to Leo, and at the time he ran to the elevator to intercept the plaintiff and beg him to save all the defendants by accepting $31,250.

In other words, not only were the representations false, not alone was the Fox deal not dead, but that deal had actually been concluded, except for the signing of a formal agreement, on the very day that the plaintiff was induced to sell out his stock to Leo.

It now appears that the Fox deal had not only been concluded by the defendants, but that a formal execution of that agreement

was probably delayed until the plaintiff had actually transferred his stock to Leo. This was conclusively established by the testimony of the defendants' witness, Ezra Cornell, an attorney for Fox Metropolitan Playhouses, Inc., who took part in the negotiations with the defendants. He definitely stated that all the basic terms were agreed upon *a month* before the closing.

The plaintiff's reliance upon these representations and his belief in their good faith and truth were fully established by his own testimony, by the testimony of his attorney Berger, by admission of defendants, and also by the circumstances of the relationship between plaintiff and defendants during the years of their association.

The confidence which the plaintiff reposed in Ungerfeld and Strauss exhibited itself to such an extent that Ungerfeld had occasion in June, 1928, to criticise the plaintiff in a letter for never coming to the office in New York " to seek information as to what is going on." Moreover, when for the first time since their association, business conditions began to affect the finances of the corporation adversely, in the summer of 1928, plaintiff engaged an accountant to examine the books of account and corporate records of the Rhebem Corporation, but before the accountant had an opportunity to complete his examination, the plaintiff, at the request of Ungerfeld, upon whose word he relied, withdrew the accountant, received no report, and was neither asked to nor did he pay for the services of the accountant.

Moreover, the affairs of the corporation were managed in an informal manner, no formal meetings were held, nor were any formal minutes for the period prior to 1929 offered in evidence at the trial by the defendants. All of this leads to the belief that the plaintiff had utmost faith and confidence in the defendants.

If we look for an additional reason why the verdict was rendered for the plaintiff, it will be found in the evidence of defendants. That testimony fully explains the result reached by the jury. While on the witness stand, Ungerfeld testified to certain facts. When he was confronted by his examination before trial, which contained important contradictions, he stated that he signed the examination before trial without reading it. He was then confronted with an important letter, and he again stated that he signed the letter without reading it. He was then confronted with important testimony given in his examination before trial and was asked this question: " Q. Was it true? A. It certainly was not." He was next confronted with testimony that he gave on direct examination. " Q. Did you partake at all in the discussion? A. Only to the extent that I insisted that Mr. Leo

know the financial condition of the company so that he would not hold me responsible later on if he did not like the deal."

He later testified as follows: " Q. Now, do you recall, in answer to the questions of your counsel before, stating in substance that you were discussing with Mr. Abramson the financial situation of the companies, but that when Leo came in, you stopped that because you would not discuss the financial condition of the companies in his presence? A. That is right."

We, therefore, have this witness testifying to one state of facts in an examination before trial, to another on direct examination, contradicting a large part of both on cross-examination; testifying that he called the attention of Leo, who was purchasing the plaintiff's stock, to the fact that the companies were practically bankrupt, or in a condition at least which would make the stock worthless, and then testifying that when he was discussing the financial condition of the companies and Leo entered the room, he refrained from further discussion of the matter. It is not likely that any jury would put much faith in such testimony, and it is not likely that Leo would have bought the stock if the condition which Ungerfeld stated existed and which he claims he explained to Leo, unless, as is the contention of the plaintiff, Leo and the others all knew at that time that the Fox deal had actually gone through and that the stock was valuable.

The defendant Strauss was confronted with testimony given by him on an examination before trial. He stated positively that the deal was not definitely closed with Fox until the 4th or 7th of January. He also stated that Kauffman knew nothing about it until that time. He was then asked the following questions: " Q. Now, when you were carrying on your conversations with Blumenthal, were you carrying them on also with Kauffman? A. Mr. Kauffman was never informed of anything. There was nothing to tell him until I actually came to a head with the Fox people. Q. On what day was it that you came to a head with the Fox people and knew that you had definitely closed the deal? A. I think on January 4th between the 4th and the 7th."

Again, he was asked: " Q. Did you communicate with Mr. Kauffman when the thing came to a head with Fox (which you now place as January 7th)? A. Why, I think I might have telephoned him and told him it looks like we can possibly sign a contract soon."

This testimony was given in the face of the fact that Kauffman, when he testified, admitted he was going over the contract for at least a month.

Benjamin Leo, one of the defendants, sought in one part of his

testimony to give the impression that he would not have purchased the stock unless he knew it was valuable and in another place attempted to show that the stock was practically worthless and that he knew that fact. The appellant argues that if Leo knew it to be worthless, why was he so anxious to purchase it?

It is also a remarkable fact that some of defendants' witnesses say there was very little said about the Fox deal at the time the contract was made at Kauffman's office on the twenty-eighth day of December, while others say it was thoroughly gone into.

The fact that this lengthy and intricate contract, which required days to prepare, was signed almost immediately after the plaintiff sold his stock to Leo is significant. It would have been physically impossible if the deal had been closed only on the seventh of January, to have prepared such a contract for signature on that day, on which day it was actually signed.

Other testimony for the defendants forcibly lent credence to the testimony of plaintiff and in many instances not only corroborated his testimony but contradicted that of the defendant's witnesses.

The trial court dismissed the complaint as against the defendant Benjamin Leo, who had pleaded in his answer that the institution by the plaintiff of the prior action to rescind the agreement by which the plaintiff parted with his stock, constituted an election, and was a bar to the institution of the present suit. It is urged that this holding constituted error as a matter of law.

The fact that prior to the institution of this action for fraud, plaintiff commenced an action for rescission in which he demanded the return of the stock does not bar this action against Benjamin Leo for fraud. Assuming that plaintiff had such a remedy, it is clear that it was wholly inadequate and that an action to recover damages for fraud was the proper remedy. The action was subsequently discontinued by consent and an order of discontinuance entered. (*Herder* v. *Clifford*, 252 N. Y. 141.)

In *Houston Mercantile Co.* v. *Powell & King* (72 Misc. 358) the court had a similar question before it. It was there said: " The election with which the courts are usually concerned consists of a choice of inconsistent remedies, as between suing on tort or in contract in case of conversion, * * * or the bringing of an action for replevin as opposed to a subsequent action to recover the purchase price, * * * or choosing between an action based on affirmance and one based on rescission of a contract or of a contractual transaction."

In the present case the plaintiff did not take an inconsistent position. The basis for both actions was fraud. The damages asked were damages because of a fraud, and there was no election

for the reason that the plaintiff did not take an inconsistent position. (*Clark* v. *Kirby*, 243 N. Y. 295; *Metropolitan Life Ins. Co.* v. *Childs Co.*, 230 id. 285, 291; *Mueller* v. *Michels*, 184 Wis. 324; *Schenck* v. *State Line Telephone Co.*, 238 N. Y. 308.)

While we are convinced that plaintiff established the allegations of fraud set forth in the complaint, we are not satisfied with the proof of damages submitted by plaintiff. As pointed out by the trial justice, the verdict of the jury necessarily implies that the value of the stock at the time of the sale was $138,148. The trial court then proceeded to show that the stock could have had no such value. It would serve no useful purpose to go into the details of the items that are alleged to make up the damages in this case.

We are convinced that the verdict is excessive under the theory of damages on which the case was submitted to the jury. This conclusion requires a new trial of the issues.

The order appealed from in so far as it grants the motion of the defendants Ungerfeld, Strauss and Rhebem Theatres Corporation to set aside the verdict and for a new trial, should be affirmed on the ground of a failure to prove the damages alleged, but not upon the ground that the verdict was against the weight of the evidence, and in other respects, so far as appealed from reversed; and the judgment as amended, in so far as appealed from, should be reversed and a new trial ordered, with costs to the appellant to abide the event.

FINCH, P. J., and MERRELL, J., concur; O'MALLEY, J., concurs in result.

Order appealed from, in so far as it grants the motion of defendants Ungerfeld, Strauss and Rhebem Theatres Corporation to set aside the verdict and for a new trial as to said defendants affirmed, and in other respects, so far as appealed from reversed. Judgment, as amended, in so far as appealed from, reversed and a new trial ordered, with costs to the appellant to abide the event.