The **PRUDENTIAL INSURANCE COMPANY OF AMERICA**, Teachers Insurance and Annuity Association of America, State Street Bank and Trust Company, as Master Trustee for the Retirement Plans of Atlantic Richfield Company and certain of its subsidiaries, and Manufacturers Hanover Trust Co., as Trustee for the Special Situations Bond Fund, Plaintiffs,

v.

**BMC INDUSTRIES, INC.,** Defendant.

**BMC INDUSTRIES, INC.,**
Third-Party Plaintiff,

v.

The **FIRST BOSTON CORPORATION,**
Third-Party Defendant.

No. 85 Civ. 4881 (RWS).

United States District Court,
S.D. New York.

April 10, 1987.

White & Case, New York City, for plaintiffs; Thomas McGanney, Robert J. Morrow, of counsel.

Cahill Gordon & Reindel, P.C., New York City, for defendant; Charles A. Gilman, Eric Hellerman, Albert Robbins, of counsel.

## OPINION

SWEET, District Judge.

In this action brought by plaintiffs Prudential Insurance Company of America ("Prudential"), Teachers Insurance and Annuity Association of America ("Teachers"), State Street Bank and Trust Company ("State Street") and Manufacturers Hanover Trust Co. ("Manufacturers"), to rescind the purchase of certain notes issued by defendant BMC Industries, Inc. ("BMC") under note agreements dated December 13, 1984, BMC has moved for a preliminary injunction seeking to enjoin plaintiffs from enforcing the notes and accelerating any debt owed by BMC to them pursuant to those note agreements, during the pendency of this action and (if BMC wins) for a reasonable period thereafter. For the reasons stated below, the motion for a preliminary injunction is denied.

**Prior Proceedings**

On December 13, 1984, plaintiffs purchased $30 million of BMC's 12$\frac{1}{12}$% convertible subordinated notes (the "Subordinated Debt") by executing agreements with BMC for the purchase of those Notes (the "Note Agreements"). On June 25, 1985, plaintiffs commenced this action to rescind the Note Agreements, alleging that BMC made material misrepresentations and omissions in connection with the sale of the Notes. Throughout this litigation, plaintiffs have consistently sought rescission of the Note Agreements, while BMC has steadfastly maintained the validity of the Note Agreements. Motions relating to transfer, the striking of counterclaims, dismissal, and certification have been made and determined. Discovery has been extensive and is near completion.

On April 1, 1987, by order to show cause, BMC requested an *ex parte* order temporarily restraining plaintiffs from taking any action to compel BMC to pay the accelerated debt or enforcing their default notices and staying all proceedings herein pending the hearing on the preliminary injunction motion. The request for a restraint was granted until all parties could appear before the court later that day. Upon appearance by counsel for Prudential, Teachers, and Manufacturers, it was acknowledged that those plaintiffs intend to bring suit for judgment based on the acceleration. Upon BMC's submission and after hearing all counsel, the temporary restraint was continued until the hearing on the preliminary injunction set for April 6. At that hearing, the testimony of Merle D. Kerr, Chief Financial Officer for BMC, was accepted into evidence.

At the close of the hearing, the court continued the original April 1 temporary restraining order for a ten-day period.

**Facts**

After the events of 1984, management of BMC was replaced, and throughout 1985 and up through August, 1986, BMC continued to tender to plaintiffs the required quarterly interest payments. New management also embarked upon a process of discontinuation of certain operations.

BMC's Form 10–K for 1986, filed with the Securities and Exchange Commission and submitted in connection with this motion, describes this discontinuation:

> In 1985, faced with a severe downturn in the electronics industry and a substantial interest burden from debt incurred in connection with acquisitions and capital

spending, primarily in Interconics, the Company decided it would be unable to provide the financial resources required to pursue the Interconics strategy. As a consequence, the Company announced in 1985 its intent to sell all but one of the operations composing the Interconics group, as well as three of its Optical Products operations and its Advanced Controls and Vacuum Press International ("VPI") (Advanced Controls and VPI are referred to jointly herein as "Advanced Controls") operations, together with its interest in a research and development joint venture. In 1984, the Company designated its contact lens manufacturing operation for sale. All of the operations designated for sale have been treated as discontinued operations for accounting purposes since 1985.

The next paragraph of the 1986 Form 10–K reads as follows:

Due to 1985 and 1986 losses, which were primarily related to provisions for loss on the disposal of the above-described discontinued operations, since the third quarter of 1985 the Company has been in default of the net worth requirement of its $70 million senior revolving credit and $30 million subordinated debt agreements. As a result of these defaults, the Company has been advised by its senior lenders and by its largest subordinated lender that the senior and subordinated debt, respectively, is now due and payable; neither the senior nor the subordinated lenders have taken any formal action to date to enforce their rights to immediate payments.

At the present time, 11 out of 13 such operations have been disposed of.

On July 30, 1986, BMC's senior bank creditors under its senior revolving credit of $70 million (the "Senior Debt") advised BMC that because of certain Events of Default under the credit agreement, resulting in part from losses in 1985 and the consequent violation of the net worth requirement imposed under the credit agreement, the Senior Debt was immediately due and payable. By letter dated October 24, 1986, the senior creditors advised BMC that

they intended to exercise their right to prevent BMC from paying interest or principal to the plaintiffs. As a result, BMC did not make the two payments due under the Note Agreements on November 1, 1986 and February 1, 1987. While the Notes carry an interest rate of 12½%, they remain Subordinated Debt, a result which Prudential apparently sought to avoid by its rescission action.

BMC retained an investment banker to prepare an offering memorandum in order to obtain $100 million to replace both the Senior Debt and the Subordinated Debt. To date, the discontinuation of operations has generated $47 million in cash, and BMC has received informal commitments for an additional $25 million. The refinancing program is presently ongoing, and BMC's assets are presently in the neighborhood of $130 million. In the course of argument, it was conceded that representatives of the Senior Debt and the Subordinated Debt have refused to meet together to consider BMC's effort to develop a refinancing plan. However, both groups of creditors have consistently been informed of BMC's efforts to escape the financial vise which has been created. According to BMC's Chief Financial Officer Merle D. Kerr ("Kerr"), the sole witness on the subject, this program will be jeopardized, and bankruptcy may result if Prudential is permitted to change its position to pursue its rights under the Notes.

By letter dated March 19, 1987, Prudential notified BMC that it now "affirmed and acknowledged" its Note Agreement. The letter provided:

We refer to that certain Note Agreement dated December 13, 1984 between you and us, which we do hereby affirm and acknowledge, and enclose a Notice pursuant to Paragraph 11 of such Agreement declaring your 12½% convertible Subordinated Notes Due November 1, 1996 in the aggregate principal amount of $30,000,000 to be due and payable together with interest accrued thereon.

Prudential thus chose to forego its claim for rescission and has been joined in that by Teachers and Manufacturers.[1]

### Conclusions

The standards for granting a preliminary injunction in the Second Circuit are well-established. The moving party must demonstrate "(a) irreparable harm; and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Sperry Int'l Trade, Inc. v. Government of Israel,* 670 F.2d 8, 11 (2d Cir.1982).

### Irreparable Harm

In the letter of March 19, 1987, Prudential affirmed and acknowledged the Note Agreement and declared the Notes to be due and payable. According to Prudential, both the nonpayment of interest and the acceleration of Senior Debt are Events of Default under ¶ 11 of the Note Agreements and entitle the plaintiffs to declare the Notes and all accrued interest due and payable.[2] BMC seeks to bar these plaintiffs from changing their position and acting on that affirmation on the grounds that any action toward compelling payment of the accelerated debt would result in bankruptcy proceedings.

In support of this conclusion, BMC has submitted the affidavit of its attorney, which states that:

If plaintiffs take any action to accelerate payment of principal and interest under the Note Agreements, BMC will be irreparably injured. The Company's ability to continue in business will be threatened. BMC's senior bank creditors have already notified BMC that under the terms of its senior loan document it may not make payments to plaintiffs (*see Exhibit*

*2*). In my opinion any action by plaintiffs to enforce accelerated payment would result in bankruptcy proceedings.

Furthermore, Kerr testified that the transformation from a rescission action to an action for damages could cause further adverse action by the senior lenders. On this evidence, BMC seeks a conclusion that a preponderance of the evidence establishes that BMC will be irreparably harmed if plaintiffs act to enforce the Notes.

█ While this court does not quarrel with the proposition that the threat of possible bankruptcy constitutes irreparable harm, *see Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975), it cannot agree that this record demonstrates that any action to enforce the Notes will make such harm imminent. BMC does not claim, and plaintiffs have in fact denied, that plaintiffs have threatened to institute involuntary bankruptcy proceedings. BMC's immediate concern with bankruptcy is that a third party, particularly the senior lenders, might institute involuntary bankruptcy proceedings because the plaintiffs have expressed an immediate intent to file a new suit and to move for summary judgment. An alternative argument is also presented that any action to enforce the Notes will make it impossible to replace the present debt, thus sending BMC into bankruptcy.

Although a judgment of $40 million would be approximately one-third of BMC's total assets of $130,000, BMC has stated that the senior lenders will not permit this sum to be paid out but will put BMC into bankruptcy instead. While such a course does not seem impossible, it has not been established on this record. Oral argument

---

**1.** Under the Notes Agreements Prudential, as holder of 66% of the Notes, had the right to accelerate all of the Notes. Teachers and Manufacturers Hanover have expressed their affirmance of the acceleration and of their Note Agreements. Plaintiff State Street Bank and Trust Company has not done so and continues to seek rescission.

**2.** According to plaintiffs, BMC is also in default of the Note Agreements by virtue of the alleged misstatements and omissions it made in connec-

tion with the transaction. The alleged failure to disclose certain material facts and events was a breach of the warranty of paragraph 12R that "no statement furnished [by plaintiffs] by or on behalf of [BMC] in connection herewith contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements ... not misleading." As such, plaintiffs claim, the failure to disclose was an Event of Default under paragraph 11(iv) as a false representation or warranty.

seemed to establish that a judgment on behalf of plaintiffs on a claim for damages, rather than rescission, would guarantee that the Senior Debt remained senior to the plaintiffs' debt in this action. Therefore, prior to actual enforcement of the judgment, it would appear that the senior lenders are not at risk vis-a-vis the plaintiffs. BMC has not adduced any evidence that the senior lenders will institute bankruptcy proceedings at the change in theory by the plaintiffs in this action. Furthermore, BMC would seem to have a remedy at law to Prudential's claims, since it can assert the ground on which it seeks an injunction as a defense against the very action that the plaintiffs intend to take. *See W.C.M. Window Co. v. Bernardi*, 730 F.2d 486, 490 (7th Cir.1984).

Therefore, BMC has failed to demonstrate irreparable harm.

**Likelihood of Success on the Merits**

BMC claims that plaintiffs are not entitled to take any action to accelerate the debt owed under the Note Agreements because they cannot after two years of litigation change their request for relief from one for rescission to one for enforcement of the Note Agreements. This claim is based on two doctrines of law: election of remedies and estoppel.[3]

The first issue is whether plaintiffs, who from the beginning of this lawsuit have asserted only the right to rescission, have waived the right to seek a remedy based on the contract. According to BMC, the institution of a suit for rescission and its maintenance for a two-year period in itself constitutes an irrevocable election to pursue rescission. The cases it cites to support this theory, however, are inapposite. In *Brennan v. National Equitable Investment Co.*, 247 N.Y. 486, 160 N.E. 924 (1928), the issue was whether certain conduct by the plaintiff constituted a ratification of the contract and an abandonment of the rescission claim. There was no discussion of whether the plaintiff had thereby lost his right to sue on the contract. In *Bell v. Yasgur*, 201 Misc. 171, 104 N.Y.S.2d 467 (Sup.Ct. Sullivan Co. 1951), the court held that once a party alleges rescission as a cause of action in the original complaint, it cannot then amend its complaint to add a claim of specific performance. Although the court stated that the alternative cause of action no longer exists because of the express election by plaintiffs to pursue rescission, its quarrel was not with the timing of the two claims—that the claim for rescission was brought first—but with the fact that the two could coexist at all. It did not permit amendment of the complaint because it would not have permitted the two causes of action to be pleaded alternatively.

That reasoning must be rejected here since, as a pleading matter, a plaintiff may plead even two mutually exclusive claims in the alternative. *See* Fed.R.Civ.P. 8(a). Once that premise is accepted, the *Bell* court's reason for denying the motion to amend fails. In addition, the *Bell* holding may be restricted to motions to amend the complaint. Since plaintiffs in this case express an intent to abandon the action for rescission, the *Bell* holding may not be binding.[4]

In *Merry Realty Co. v. Shamokin & Hollis R.E. Co.*, 230 N.Y. 316, 130 N.E. 306 (1921), the jury granted damages as in an action at law, although such a verdict was inconsistent with the pleadings and the theory of the action, which called for rescission. *See id.* at 323, 130 N.E. 306. The Court of Appeals held this to be error. Although the Court stated that one who

---

**3.** Both parties assume in their papers that New York law applies to these issues. At least insofar as this is an action brought under the federal securities laws, this court is not bound by New York law. Nevertheless, since the reasoning under both federal and state law is similar, this court will rely on the law of New York.

**4.** In substance, the amendment of the complaint to add an alternative theory and the institution of a new action might seem to be identical. Nevertheless, different treatment of the two is consistent with the New York view that, at least when a case is coming close to trial, a party should not be permitted to pursue two mutually exclusive theories at once. *See Clark v. Kirby*, 243 N.Y. 295, 301, 153 N.E. 79 (1926) (discussed *infra*).

"commences" an action to rescind has made an election and cannot maintain an action on the contract, *see id.* at 325, 130 N.E. 306, its holding involved a case that had already gone to the jury. Furthermore, the Court also recognized that the counterclaim plaintiff seeking rescission could get damages in lieu thereof if rescission "was impossible owing to changed circumstances or is inequitable for any reason." *Id.*

In *Clark v. Kirby*, 243 N.Y. 295, 153 N.E. 79 (1926), the New York Court of Appeals held that an action brought for damages in Missouri after a suit for rescission had been filed in New York did not preclude plaintiff from pursuing the suit for rescission. In dictum, however, the Court commented on New York law as it governed the Missouri action. If the Missouri action were an action implicitly affirming the contract, the Court noted that the defendant could raise as a valid defense the pending New York action for rescission. *See id.* at 301, 153 N.E. 79. The plaintiff could not pursue both remedies at once. Nevertheless, the court recognized that the institution of a rescission action is not an irrevocable election:

> In this state we say that where a party, knowing all the facts, elects to sue in rescission instead of for damages, he must pursue the course he has taken. Even then, if the remedy chosen be insufficient or inadequate or useless, the rule has not barred the plaintiff from taking other timely methods to obtain his rights ... All procedure is merely a methodical means whereby the court reaches out to restore rights and remedy wrongs; it must never become more important than the purpose which it seeks to accomplish. Unless some necessary requirement has been omitted, a wrong move or a mistake in the method of seeking relief from the courts ought not to furnish protection for a wrongful act.

*Id.* at 303, 153 N.E. 79.

The language on which BMC relies in these cases supports an entirely different proposition: that a party, unless it pleads in the alternative, cannot simultaneously pursue both an action for rescission and an action affirming the contract. *See, e.g., Clark v. Kirby*, 243 N.Y. 295, 301, 153 N.E. 79 (1926); *Silvestri v. Associated Gas & Electric Corp.*, 240 A.D. 179, 268 N.Y.S. 763 (4th Dep't 1934). Because they are mutually exclusive remedies, a party can plead them alternatively, *see Merry Realty*, 230 N.Y. at 324, 130 N.E. 306, but at some point he must elect between the two. The cases cited by BMC do not hold that maintaining a suit for rescission is such an election.

Instead, the New York courts have held that, under certain circumstances, a plaintiff who abandons his suit for rescission may institute an action based on his rights under the contract. In *Hill v. McKinley*, 254 A.D. 283, 4 N.Y.S.2d 656 (1st Dep't 1938), the plaintiff first sued to rescind a number of agreements, including an indemnification agreement, on the grounds of fraud by the defendant. 4 N.Y.S.2d at 658. Later the plaintiff voluntarily discontinued his rescission action and sued the defendant to recover sums due under the indemnity agreement. The court permitted the plaintiff to institute such an action.

In doing so, the court stated:

> Under the law of this state, a party claiming to be defrauded, who seeks relief by means of rescission of a contract, is not bound thereby and is not barred from subsequently waiving rescission and suing upon the contract where, as in the present case, the defendant does not acquiesce in the rescission or where the action based upon the rescission has not resulted in a final judgment on the merits. *Clark v. Kirby*, 243 N.Y. 295, 303, 153 N.E. 79; *Schenck v. State Line Telephone Co.*, 238 N.Y. 308, 144 N.E. 592, 35 A.L.R. 1149; *Slack v. Ellis*, 247 App. Div. 467, 286 N.Y.S. 633; Williston on Contracts, Rev.Ed. 1937, vol. V, § 1527, p. 4277; Black, Rescission in Cancellation, 2d Ed., vol. I, § 14, vol. 3, §§ 558 and 560.

Furthermore, the court flatly rejected defendant's contention that institution of the first suit constituted a conclusive election:

It is apparently the position of defendant here that because plaintiff sued upon a rescission to recover $550,000, the amount of his investment in the partnership, though he chose to abandon this claim before obtaining a judgment on the merits, he may not now recover the sum admittedly due under the terms of defendant's indemnity agreement. He has lost everything, it is urged, because he ventured to ask for rescission. Such a claim is untenable.

Similarly, the Appellate Division in *Abramson v. Leo*, 240 A.D. 343, 269 N.Y.S. 814 (1st Dep't 1934), also held that a plaintiff who discontinued his suit for the "wholly inadequate" remedy of rescission was not precluded from instituting an action for damages. *Id.* at 357, 269 N.Y.S. 814. The court stated:

> The fact that prior to the institution of this action for fraud, plaintiff commenced an action for rescission in which he demanded the return of the stock does not bar this action against Benjamin Leo for fraud. Assuming that plaintiff had such a remedy, it is clear that it was wholly inadequate and that an action to recover damages for fraud was the proper remedy.

*Id.* at 357, 269 N.Y.S. 814.

■ In the present case, plaintiffs have not made the claim that they have acted now to affirm the contract after two years of pursuing the suit for rescission because rescission is in itself inadequate. *See Abramson v. Leo*, 240 A.D. 343, 346, 269 N.Y.S. 814 (1934) (prior rescission action was "wholly inadequate" because the plaintiff later learned that his remedy was not an action for rescission). Instead, now that BMC has defaulted on its payments of interests, plaintiffs see a more expedient way of getting a judgment in this case by moving for summary judgment on the issue of the default of payments rather than misrepresentations. Of course, by affirming the contract, the plaintiffs have by their own actions cut off any remedy of rescission. Rescission is now inadequate only because plaintiffs have chosen to abandon it.

Although Prudential has created a situation in which the only remedy requested in the original action is now moot, none of their alleged losses can be recovered if they cannot sue now for damages under the contract. To hold that they have waived their right to recover anything at all by deciding now, after a recent change in circumstances, to affirm the contract, is too harsh a result. The claims of fraud under theories of rescission and contract damages are identical. Although plaintiffs chose to pursue rescission with their eyes wide open, the decision to put an end to this lawsuit based on a default that occurred in November, 1986 "ought not to furnish protection for a wrongful act." *Clark v. Kirby*, 243 N.Y. 295, 303, 153 N.E. 79 (1926).

■ The second issue raised by BMC is whether plaintiffs are equitably estopped from prosecuting this case under a theory other than rescission on the grounds that BMC has relied to its detriment on the plaintiffs' longstanding demand for rescission. Although BMC has not cited any cases in which the remedy initially demanded was held to be a binding election precluding a change in the demand for relief, the dictum it cites seems to fairly state, in this context, the doctrine of equitable estoppel:

> An estoppel rests upon the word or deed of one party under which another rightfully relies and so relying changes his position to his injury. When this occurs it would be inequitable to permit the first to enforce what would have been his rights under other circumstances.

*Metropolitan Life Insurance Co. v. Childs Co.*, 230 N.Y. 285, 292–93, 130 N.E. 295 (1921); *accord Twentieth Century-Fox Film Corp. v. National Publishers, Inc.*, 294 F.Supp. 10, 12 (S.D.N.Y.1968) ("A binding election occurs only where one party pursues a remedy to a point where, in reliance upon such action, the other changes his position to his detriment. Thereupon the first party is estopped or precluded from pursuing an inconsistent remedy").

In this case, however, BMC has failed to show by a preponderance of the evidence

that BMC did rely on plaintiffs' repeated assertion that this action is for rescission only. In support of its claim of reliance, BMC adduced testimony from Kerr that in reliance on the claim for rescission, BMC undertook a divestiture program involving 11 of its 13 operating units and set about attempting to refinance its debt. These statements notwithstanding, BMC has not demonstrated how it acted differently because the action was for rescission rather than under the contract, and logically it does not seem possible to do so.

Plaintiffs could have sued on a contract rather than rescission theory by alleging breach of BMC's warranty under paragraph 12R of the Note Agreement. The allegations of material misstatements and omissions would have been the same as in the rescission action. Furthermore, the relief would have been the same in either action. Under the rescission theory, plaintiffs seek $30 million plus interest. Under a contract theory, plaintiffs would seek their damages from purchasing $30 million in Notes, presumably $30 million plus interest. Although the contract provides for payment over a 12 year period, a judgment would probably include those payments and, even if not, could constitute a default under paragraph 11(iv), giving plaintiffs a right to accelerate all payments.[5] Thus, whether plaintiffs sought $30 million in a rescission suit alleging fraud or $30 million in a breach of contract suit alleging fraud, no evidence has been submitted to establish a reason for BMC, as a business and financial matter, to react any differently.

Although BMC's Form 10–K raises serious questions as to whether rescission was actually the cause of the losses in 1985 and 1986, the court need not reach that question, given the failure to demonstrate how BMC could have relied on the plaintiffs' choice of rescission as a remedy.

**Balance of Hardships**

Understandably, BMC is seeking more time to replace the $100 million in debt it now owes to the plaintiffs and the senior lenders, in order to completely pay off the plaintiffs and put this lawsuit behind it. Nevertheless, it has failed to demonstrate that irreparable harm is either likely or imminent. Therefore, neither plaintiffs nor BMC would seem to be exposed to immediate harm, and the balance of hardships weighs in no one's favor.

Obviously left for another day are the questions of a stay in the event Prudential follows its intended course, the merits and timing of any acceleration, the conditions upon which this apparently mooted action can be discontinued, and a myriad of other issues which highly skilled counsel for both sides can be expected to raise.

The motion for a preliminary injunction is denied. Because BMC has not shown irreparable harm, the court will not exercise its discretion to grant BMC's motion for a further stay pending an application by BMC for a stay pending an appeal to the Court of Appeals.

IT IS SO ORDERED.

---

5. Paragraph 11(iv) of the Note Agreement provides that plaintiffs may accelerate the debt if "any representation or warranty made by [BMC] herein or in any writing furnished in connection with or pursuant to this Agreement shall be false in any materially adverse respect on the date as of which made."